# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**CONOCOPHILLIPS COMPANY,**

     **Plaintiff,**

**v.**                         **Case No.  8:06-cv-2123-T-30MAP**

**U.S. AGRI-CHEMICALS CORPORATION,**

     **Defendant.**

_____/

# ORDER

THIS CAUSE comes before the Court upon Plaintiff Conocophillips Company's Motion to Dismiss U.S. Agri-Chemicals' Counterclaim (Dkt. 9) and Defendant U.S. Agri-Chemicals Corporation's Response in Opposition to the Same (Dkt. 13).

## MOTION TO DISMISS STANDARD

Under Conley v. Gibson, 355 U.S. 41, 45 (1957), a district court should not dismiss a complaint "for failure to state a claim unless it appears beyond a doubt that the plaintiff can prove no set of facts" that would entitle the plaintiff to relief.  See also Bracewell v. Nicholson Air Services, Inc., 680 F.2d 103, 104 (11th Cir.1982).  To survive a motion to dismiss, a plaintiff may not merely "label" his or her claims, but at a minimum must provide a "short and plain statement of the claim" that "will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Conley, 355 U.S. at 47(quoting Fed.R.Civ.P. 8(a)(2)).  In deciding a motion to dismiss, a court can examine only the four

corners of the complaint.  Rickman v. Precisionaire, Inc., 902 F.Supp. 232 (M.D.Fla.1995).

Additionally,  a court must accept a plaintiff's well pled facts as true and construe the

complaint in the light most favorable to the plaintiff.  See Scheuer v. Rhodes, 416 U.S. 232

(1974); Howry v. Nisus, Inc., 910 F.Supp. 576 (M.D.Fla.1995).   However, when no

construction of the factual allegations of a complaint will support the cause of action,

dismissal of the complaint is appropriate.  See Executive 100, Inc. v. Martin County, 922

F.2d 1536 (11th Cir.1991), cert. denied, 502 U.S. 810 (1991);  Powell v. United States, 945

F.2d 374 (11th Cir.1991).

## FACTUAL BACKGROUND[1]

On December 31, 1980, United States Steel Corporation and W.R. Grace & Co.

formed Ft. Meade Chemical Products (hereinafter "FMCP").[2]  The business of FMCP was

to operate a phosphate processing plant for the production of phosphoric acid and associated

co-products.   This case involves a dispute between the parties over contractual

indemnification, specifically, which party is responsible for indemnifying the other for

certain costs associated with the closure of an unlined gypsum stack[3] located on U.S. Agri-

Chemicals' property.

---

[1] These facts are those alleged by U.S. Agri-Chemicals in its Counterclaim, and are assumed, for purposes of this Motion, to be true.

[2] The Parties are successors to separate lines of predecessor entities involved with FMCP.

[3] As a byproduct of producing phosphoric acid, a substance known as phosphogypsum is created. Phosphogypsum is saturated with acidic water and contains radium and other potentially toxic materials and can be radioactive.  Because there is no commercial use for phosphogypsum, the industry has developed a practice of storing the toxic substance in what is generally referred to as a gypsum stack, or "gyp stack."

The gyp stack at issue in this case has been in use since 1961 and is adjacent to a phosphate processing plant which has been in operation since that time.  Phosphogypsum was stored in this gyp stack until 2001, when a newer stack was created.  This new stack stored phosphogypsum from 1997 to 2005.

In or around April 1982, Ridgewood Chemical Corporation was substituted for W.R. Grace & Co. as a partner in the FMCP general partnership.  Subsequently, in May 1982, USSAC, Inc. was substituted for United States Steel.  In May of 1988, USSAC and Ridgewood executed Articles of Partnership which supplemented the original Articles of Partnership entered between their respective successors.  Pursuant to the supplemental Articles of Partnership, USSAC and Ridgewood each owned a 50% interest in the assets of FMCP.  Additionally, each was responsible for 50% of the costs and expenses associated with FMCP.

In February 1989, USSAC assigned its 50% partnership interest in FMCP to USX Corporation. Later that same month, USX assigned its interest to Florida Agri-Chemicals Corporation.  One month later, Florida Agri-Chemicals changed its name to U.S. Agri-Chemicals Corporation.

On August 31, 1993, U.S. Agri-Chemicals and Ridgewood entered a Sale and Purchase agreement wherein U.S. Agri-Chemicals, having acquired Ridgewood's 50%

interest in the FMCP general partnership,[4] became the sole owner of the plant, gyp stack and other assets of the FMCP general partnership. The issues disputed in this litigation involve the differing interpretations of Section 9.1 of the Agreement concerning the indemnification obligations of each party for the costs associated with the closure of the gyp stack.

Section 9.1 details the commitment of Ridgewood[5] to indemnify U.S. Agri-Chemicals and hold it harmless from four types of loss, liability, cost, damage, claim and expense.  Two such provisions are:  (1) any liability or claim under any environmental laws relating to any event, action or failure to act which occurred during the period from December 31, 1980 to January 14, 1994 (the closing date), to the extent attributable to Ridgewood Chemical Corporation's 50% partnership interest in FMCP; and (2) "its proportionate share (as measured by the quantity of phosphogypsum deposited in the gyp stack attributable to Seller's partnership share and during the period Seller owned its partnership interest in FMCP) of the reasonable costs paid for the closure of the presently existing FMCP gypsum stack."[6]

---

[4] After the 1993 Agreement, U.S. Agri-Chemicals continued to operate the Plant as well as use the gyp stack for placement and storage of the phosphogypsum.

[5] Tosco Corporation, a Nevada Corporation, guaranteed the performance of Ridgewood's obligation under Section 9.1 (iii) of the agreement. ConocoPhillips is the successor to Ridgewood and Tosco and therefore has assumed their indemnification obligations under the 1993 Agreement.

[6] According to U.S. Agri-Chemicals, the method for calculating Ridgewood's "proportionate share" was never disputed.  Under the original 1997 calculations for the gyp stack closure cost allocation, the total tonnage of production associated with the gyp stack was calculated (10,272,963 tons) and then the total production after the 1993 Agreement was calculated (1,528,380 tons).  From  these amounts, it was determined the proportionate share of the expense to Tosco, through December 1996, equaled 42.6 percent. The balance (57.4 percent) was the non-indemnified obligation of U.S. Agri-Chemicals.  According to U.S.

(continued...)

Pursuant to the 1993 Agreement, the parties held periodic meetings to discuss gyp stack closure plans, activities, and expenses.  According to U.S. Agri-Chemicals, during both these meetings as well as through other communications, ConocoPhillips[7] and its predecessors in interest were adequately informed regarding the necessary closure plans, activities and expenses, in addition to all anticipated regulatory changes which could affect closure requirements and costs.

In attempting to close the gyp stack, the parties solicited the expertise of Ardaman & Associates.   Ardaman provided engineering, geological, regulatory, and associated professional and expert consultative services, and recommended that in order to substantially decrease the costs of the gyp stack, U.S. Agri-Chemicals should continue placing phosphogypsum  on the existing stack and contour the stack, rather than placing all of the phosphogypsum on the newer expansion stack.  According to Ardaman, contouring, by placement of the additional phosphogypsum, would reduce the horizontal surface of the top of the gyp stack, thereby reducing the area needing to be lined under the stack closure rules.  This method would result in an estimated cost savings in excess of $300,000.00.   However, because of the reduced closure costs associated with the continued placement of phosphogypsum, and because the continued placement constituted part of the closure

---

[6](...continued)

Agri-Chemicals, neither Ridgewood nor Tosco, the original parties to the 1993 agreement, ever disagreed with this indemnity obligation calculation and made all payments of invoices calculated using this method.

[7] In February 2001, Phillips Petroleum merged with Tosco and assumed all obligations of Tosco under the 1993 Agreement.  In August 2002, Phillips Petroleum Company merged with Conoco, Inc. and assumed all indemnification responsibilities of Tosco and Ridgewood under the 1993 Agreement.

process, the appropriate treatment of such closure under the indemnification provisions of the 1993 Agreement was unclear.  As a result, this issue became a point of negotiation between the U.S. Agri-Chemicals and Tosco during 1998.

On September 10, 1998, Tosco proposed two options for treating the additional placement of phosphogypsum: (1) allow U.S. Agri-Chemicals to use the gyp stack without allocating costs to Tosco and without adjusting the previously calculated 57.4% to 42.6% allocation percentage for closure costs; or (2) share the costs of placing phosphogypsum on the gyp stack while allowing the additional amounts of phosphogypsum to decrease Tosco's allocation percentage for closure costs.

In November 1998, U.S. Agri-Chemicals and Tosco agreed that U.S. Agri-Chemicals would receive a management fee in the amount of 7% of incurred expenses, representing U.S. Agri-Chemicals' services in managing the closure project.  U.S. Agri-Chemicals and Tosco agreed to share the 7% charge based on the previously agreed allocation of 42.6% of total costs to Tosco and 57.4% to U.S. Agri-Chemicals.

At some time between 2001 and March 2002, the Florida Legislature directed the Florida Department of Environmental Protection to re-evaluate the financial responsibility rules regarding phosphogypsum stacks.[8]  The re-evaluation prompted new regulations for closure of phosphogypsum stacks.  As these regulatory changes developed, U.S. Agri-

---

[8] This re-evaluation was prompted by an acidic water spill from Mulberry Phosphate's property and its consequential bankruptcy.  Additionally, water inventory management concerns became predominant due to a combination of heavy rainfall and water management and treatment.

Chemicals communicated the changes along with the potential increase in closure costs to Phillips and later to its successor ConocoPhillips.   However, the new regulations raised questions among the parties regarding how the additional expenses would be handled under the indemnification provision in the 1993 Agreement.

In March 2003, the parties agreed the additional expenses would be shared, and that those costs associated with the closing of the gyp stack, excluding water and cooling pond issues, would be allocated 57.4% to U.S. Agri-Chemicals and 42.6% to ConocoPhillips. Water reduction and treatment items were billed at 50% of incurred costs.  ConocoPhillips, in keeping with its agreement, paid all billings without objection as to the method of calculation or to the allocation of percentages, until January 2006.  According to U.S. Agri-Chemicals,  ConocoPhillips has failed to pay bills and has objected to both the cost items for which indemnification is sought and to the percentage upon which the billings were allocated.  To date, ConocoPhillips has refused to pay bills in excess of $18,620,894.13.

In response to ConocoPhillips refusal to pay, U.S. Agri-Chemicals filed a counterclaim[9] seeking declaratory relief (Count I), and alleging Breach of Contract (Count II) and Open Account (Count III).

---

[9] ConocoPhillips filed suit against U.S. Agri-Chemicals seeking declaratory and injunctive relief and alleging unjust enrichment (Dkt. 1).

## DISCUSSION

ConocoPhillips seeks dismissal of U.S. Agri-Chemicals Counterclaim, specifically its claims for Declaratory Relief (Count One), Breach of Contract (Count Two) and Open Account (Count Three).

**A.     Count One- Declaratory Relief.**

U.S. Agri-Chemicals seeks declaratory relief pursuant to the Declaratory Judgment Act.  See 28 U.S.C. § § 2201.  The Declaratory Judgment Act provides a district court discretion in determining whether to declare the rights or other legal interest of a party so seeking.  See Clark Const. Group, LLC v. Travelers Excess & Surplus Lines Company, 470 F.Supp.2d 1350, 1351 (M.D. Fla. 2006) (citing 28 U.S.C. § § 2201(a)).  To state a claim for declaratory judgment, a party must allege: "(1) a bona fide adverse interest between the parties concerning a power, privilege, immunity or right of a plaintiff[;] (2) the [party's] doubt about the existence or non-existence of this right or privilege; and (3) that [the party] is entitled to have the doubt removed."  Quadomain Condominium Ass'n, Inc. v. QBE Ins. Corp., 2007 WL 1424596 at 2 (S.D. Fla. 2007).   In reviewing Count One of the Counterclaim, U.S. Agri-Chemicals has sufficiently alleged a claim of declaratory relief (Dkt. 5 at 12).  ConocoPhillips' Motion to Dismiss as to Count One is hereby denied.

**B.     Count Two - Breach of Contract.**

To state a cause of action for breach of contract, a party must alleged the existence of a valid contract, a material breach of the contract and damages.  See Morse, LLC v. United Wisconsin Life Ins. Co., 356 F.Supp.2d 1296, 1299 (S.D. Fla. 2005).  U.S. Agri-Chemicals alleges a valid contract existed between the parties, i.e., that ConocoPhillips was to indemnify U.S. Agri-Chemicals for all losses sustained at any time resulting from liabilities or claims incurred "under any environmental laws relating to any event."  (Dkt. 5, Ex. 2 at 11).  It further alleges the contract was breached when ConocoPhillips failed to pay its share of the closure costs.  ConocoPhillips argues in its Motion to Dismiss that the contract between the parties, which is attached to the Counterclaim, specifically states that pursuant to Section 9.2 ConocoPhillips was only to indemnify U.S. Agri-Chemicals for those environmental laws relating to events which occurred prior to the closing date.  According to ConocoPhillips, the agreement to indemnify U.S. Agri-Chemicals dealt strictly with those events occurring before the closing date, and therefore U.S.  In looking at the allegations of the Counterclaim, and taking them in the light most favorable to U.S. Agri-Chemicals, See Flamenbaum v. Orient Lines, Inc., 2004 WL 1773207 at 4 (S.D. Fla. 2004) (citing St. Joseph's Hosp., Inc. v. Hosp. Corp. of Am., 795 F.2d 948, 953 (11th Cir. 1986)),  this Court finds the allegations in the Counterclaim are sufficient to withstand a Motion to Dismiss. Whether or not U.S. Agri-Chemicals will be able to sustain its claim for breach of contract on a Motion for Summary Judgment is a matter for another day.

C.      **Count Three - Open Account.**

"An open account is 'an unsettled debt arising from items of work and labor, goods sold and delivered with the expectation of further transactions subject to future settlement and adjustment.'" Morse, LLC v. United Wisconsin Life Ins. Co., 356 F.Supp.2d 1296, 1299 (S.D. Fla. 2005) (citations omitted).  In order to properly present a claim for open account, a party must allege (1) a contract existed between the parties; (2) the amount claimed represents either the agreed on sales price or the reasonable value of the goods delivered; and (3) the goods were actually delivered.  See Evans v. Delro Industries, Inc., 509 So. 2d 1262, 1263 (Fla. 1st DCA 1987).  In reviewing the allegations of the Counterclaim, U.S. Agri-Chemicals has sufficiently alleged a claim for open account.  It has alleged an indemnification agreement existed between the parties whereby both parties agreed to pay portion of closure costs.  It has also alleged ConocoPhillips' failure to pay its share of the closure costs, notwithstanding U.S. Agri-Chemicals' payment of its share.  Finally, U.S. Agri-Chemicals has provided an itemized list of the bills not paid.[10]  Based on these allegations, this Court finds ConocoPhillips motion as to Count III is denied.

It is therefore ORDERED AND ADJUDGED that:

1.      Plaintiff Conocophillips Company's Motion to Dismiss U.S. Agri-Chemicals' Counterclaim (Dkt. 9) is **DENIED.**

---

[10] While ConocoPhillips argues the list provided is insufficient as it is not an itemized copy of the account and is not attached to the Counterclaim, this Court finds the list is sufficient to satisfy the pleading requirements of Rule 8(a), Federal Rules of Civil Procedure.

2.      Plaintiff has **twenty (20) days** from the date of this Order to file an Answer to

U.S. Agri-Chemicals' Counterclaim.

**DONE** and **ORDERED** in Tampa, Florida on July 11, 2007.


_____
JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE


**Copies furnished to:**
Counsel/Parties of Record


S:\Odd\2006\06-cv-2123 Motion to Dismiss Counterclaim.frm